UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ABODE AFFORDABLE HOUSING, LLC,

Plaintiff,

*– against –*

ALBERT BURR MCCALL II, *Co-Personal Representative of the Estate of Albert Burr McCall, and* MENDA ELIZABETH MCCALL HOLMES, *Co-Personal Representative of the Estate of Albert Burr McCall*,

Defendants.

**OPINION & ORDER**

23 Civ. 6887 (ER)

RAMOS, D.J.:

Abode Affordable Housing ("Abode") brings this action against Albert Burr McCall II and Menda Elizabeth McCall Holmes (together the "Representatives"), as representatives of the estate of their father Albert Burr McCall (the "Estate"), for breach of contract. Before the Court is Abode's pre-discovery motion for partial summary judgment. Doc. 64. In opposing the motion, the Representatives submitted a declaration pursuant to Rule 56(d), asserting that they are unable to present facts essential to their opposition because discovery has yet to occur. *See* Doc. 78. For the reasons set forth below, Abode's motion for partial summary judgment is denied without prejudice, and the parties are directed to proceed to discovery.

## I. BACKGROUND

### A. Factual Background[1]

*1. McCall's Purchase of the Macombs Partnership Interest*

At some point prior to 2015,[2] Albert Burr McCall purchased a 6.19% limited partnership interest in Macombs Village Associates L.P. (the "Partnership Interest"). Doc. 66 ¶ 1.[3] According to Section 15b(i) of Macombs' partnership agreement, "[t]here shall be no [t]ransfer of the whole of any portion of a Partnership Interest . . . without the prior written consent of the Managing General Partner." Doc. 68 ("Kraus Decl.") ¶ 3; Doc. 68-1 (the "Partnership Agreement") at 28.

The Representatives have no personal knowledge of McCall's purchase of the Partnership Interest, nor does the Estate have any documentation concerning whether McCall agreed to be bound by the Partnership Agreement at the time of this purchase. Doc. 79 ("McCall II Decl.") ¶¶ 5–6.

*2. The 2015 Agreement between McCall and Abode*

On March 30, 2015, Abode made McCall an offer to purchase his Partnership Interest for $130,000. McCall II Decl ¶ 7; Doc. 79-1. On April 22, 2015, McCall signed a contract for the assignment of the Partnership Interest to Abode, and on June 22, 2015, Abode countersigned. *See* Doc. 67-1 (the "Abode Assignment Agreement") at 5. McCall

---

[1] The following facts are taken from the undisputed facts in Abode's Rule 56.1 statement as well as the exhibits and declarations that both parties attach to their submissions.

[2] Abode does not provide a date for this initial purchase and the McCall Representatives indicate they do not know when this purchase occurred. *See* Doc. 79 ¶ 6.

[3] According to Mitchell Kraus, a representative of the general partner of Macombs, Macombs was created "for the exclusive purpose of owning the Section 8 housing project known as Macombs Village." Doc. 68 ("Kraus Decl.") ¶ 2.

II notarized his father's signature, Doc. 66 ¶ 7, though he asserts that he notarized many documents for his father over the years and had no personal knowledge of the transaction, McCall II Decl. ¶ 4.[4]

According to preliminary statement in the Abode Assignment Agreement, "[McCall] is desirous of selling the [Macombs Partnership] Interest to [Abode], to allow [Abode] to become a substitute limited partner in [Macombs] in the place and stead of [McCall]." Doc. 67-1 at 2.

Section one states that, "[i]n consideration of the foregoing premises, and in consideration of . . . $130,000[], the receipt and sufficiency of which is hereby acknowledged, [McCall] hereby sells, assigns, transfers, and conveys to [Abode], its successors, and assigns, all rights, title, and interest of [McCall] in, to, under, and as owner of, the [Partnership] Interest . . ." *Id.*

Section two states that, "[McCall] hereby requests the general partner . . . of [Macomb] to approve this Assignment and to admit [Abode] as a substitute limited partner . . . in the stead of [McCall]. Upon admission of [Abode] as a substitute limited partner . . . [Abode] agrees to be bound by the terms and conditions of the [Partnership Agreement] . . . ." *Id.*

Section four defines cooperation between the parties, requiring that McCall provide Abode all partnership communications and distributions. *Id.* at 3. Upon the request of Abode, the agreement requires that McCall perform any acts necessary to

---

[4] In his declaration, McCall's accountant, Dan Hancock, also asserts that he has no recollection of McCall sharing this agreement and that he does not believe he was involved in the transaction. Doc. 80 ¶ 4.

effectuate the transfer of the Partnership Interest or to allow Abode to exercise its legal rights as a limited partner. *Id*.

Section six indicates that, "in order to authorize and entitle [Abode] to exercise on [McCall's] behalf the rights and remedies," the parties also executed a Power of Attorney, the terms and conditions of which are incorporated into the Abode Assignment Agreement. *Id.* at 4. The Power of Attorney grants Abode the authority, *inter alia*, to inspect the books, demand and receive distributions, exercise any prevalent right to vote, and to "sell, convey, assign, encumber or otherwise dispose of the [Macomb] Partnership Interest." Doc. 49-3 at 1. Further the Power of Attorney requires that McCall "will not exercise or attempt to exercise any right, power or authority which [Abode] may exercise pursuant to this Power of Attorney, unless expressly requested in writing by [Abode] . . ." *Id.*

Section eight of the Abode Assignment Agreement states that the agreement, as well as the Power of Attorney, is governed and construed in accordance with New York law. Doc. 67-1 at 4. Finally, section nine of the agreement includes a severability clause, which states:

> Notwithstanding any factor that may render this Assignment invalid or unenforceable as to third parties, including without limitation [Macomb], or the general partner of [Macomb], this Assignment is a valid and enforceable agreement between [McCall] and [Abode] and their representatives, successors in interest, and assigns.

*Id.* at 5.

An escrow agreement (the "Escrow Agreement"), which McCall also signed on April 22, 2015, specifies that the sale of the Partnership Interest would be affected via escrow, with Riverside Abstract LLC ("Riverside Abstract") serving as the escrow agent.

Doc. 67-2.[5] The Escrow Agreement required that McCall provide signed and notarized copies of the Abode Assignment Agreement and the Power of Attorney to Riverside Abstract. *Id.* at 2. Within ten days after delivery, Abode was required to deliver a $26,000 deposit to Riverside Abstract; and after 120 days, to deliver fully executed copies of the Abode Assignment Agreement and the Power of Attorney along with an additional $104,000. *Id*. Riverside Abstract was then required to deliver the fully executed documents and the $130,000 to McCall. *Id.*[6]

Abode asserts that it timely made the required payments under the Abode Assignment Agreement. McCall provided Riverside Abstract signed copies of the Abode Assignment Agreement and the Power of Attorney on April 27, 2015 and Abode asserts that it sent Riverside Abstract $26,000 on April 30, 2015[7] and $104,000 sometime before August 6, 2015.[8] Docs. 86-1 ("Waschman Decl.") ¶¶ 4–5, 8–9.

Abode also attaches copies of two checks from Riverside Abstract: a $26,000 check made out to McCall's wife, Virginia McCall, and a $104,000 check made out to

---

[5] While the Escrow Agreement that Abode provides was signed by McCall on April 22, 2015, the signature line for Abode is blank. Doc. 67-2 at 4.

[6] The Estate has no records showing when McCall provided notarized copies of either the Abode Assignment Agreement or the Escrow Agreement. McCall II Decl. ¶ 10.

[7] In support, Abode attaches the declaration of Boruch Waschman, a managing member of Abode, who states the transfer of $26,000 to Riverside Abstract occurred on April 30, 2015; a declaration of Hershy Biegel, who effectuated the transfer; and emails between Waschman and Max Perl, a Riverside Abstract employee, who confirmed Riverside Abstract received the transfer. Waschman Decl. ¶ 5; Doc. 86-5 ("Biegel Decl."); Doc. 86-3.

[8] In support, Abode attaches the declaration of Waschman, who directed Biegel to effectuate the transfer; a declaration of Biegel who effectuated the transfer; and emails between Waschman and Perl, who confirmed that Riverside Abstract received the transfer. Waschman Decl. ¶ 9; Biegel Decl. ¶ 4; 86-4 (August 6, 2015 email from Wachsman to Hancock stating that Abode has countersigned all documents and provided all funds to Riverside Abstract; August 13, 2015 email from Perl confirming that the documents and funds were sent to McCall).

McCall. Doc. 67-4.[9] Further, Abode attaches a screenshot of what is purportedly a copy of Riverside Abstract's bank account, which has a line item for $104,000 on "Sep 01." Doc. 67-5.

Waschman declares that McCall requested an additional $10,000 promissory note (the "Promisssory Note") at some point after executing the Abode Assignment Agreement, which Abode also provided McCall. Waschman Decl. ¶ 7, 9; *see also* Doc. 67-3.[10] The Promissory Note is dated August 6, 2015. Doc. 67-3. The Representatives assert that they have no knowledge nor proof concerning whether the note was requested as a part of the Abode Assignment Agreement or the Escrow Agreement. Doc. 77 ¶ 4.

The Estate has no evidence that McCall was timely paid by Abode, nor any evidence to suggest McCall deposited any checks, if they were received. McCall II Decl. ¶ 9.[11] Further, the Estate has no records showing that Abode ever contacted McCall about the Partnership Interest after 2015, nor that McCall ever sent Abode tax forms he received from Macombs for the tax years of 2015–17. McCall II Decl. ¶ 12.

*3. The 2017 Agreement between McCall and LP Solutions*

In an agreement dated March 22, 2017, McCall purported to sell the same Partnership Interest to LP Solutions Fund, LCC ("LP Solutions") in exchange for $43,330. Doc. 66 ¶ 21–24; *see* Doc. 69-1. The agreement (the "LPS Assignment Agreement") also purported to grant power of attorney to LP Solutions. Doc. 66 ¶ 25.

---

[9] The copy of the check provided to the Court, for $26,000 to McCall's wife, is illegible. However, while the McCall Representatives dispute that it is an authenticated business record, they do not dispute the amount or recipient. *See* Doc. 77 ¶ 4.

[10] Abode provides a copy of a promissory note, dated August 6, 2015, and signed by Abode, which states that McCall is the holder of the $10,000 promissory note and shall be paid within two years. Doc. 67-3.

[11] McCall's bank does not have records going back to 2015. McCall II Decl. ¶ 11.

According to the governing law clause, the LPS Assignment Agreement would be interpreted and enforced under the laws of Maine. Doc. 69-1 at 5.

The LPS Assignment Agreement was signed by McCall and Marci Booth, the Chief Financial Officer of LP Solutions. *Id*. At the time of signing, McCall was 87 years old and had been diagnosed with Alzheimer's Disease. McCall II Decl. ¶ 13.

Pursuant to the LPS Assignment Agreement, on April 7, 2017, LP Solutions issued a certified check for $43,330 to McCall. Doc. 66 ¶ 23. Alan Peoples, an acquisition specialist for LP Solutions, declares that the check was mailed to McCall. Doc. 69 ¶ 5 ("Peoples Decl.").

In early April 2017, McCall provided his accountant, Dan Hancock, with a stack of documents including the LPS Assignment Agreement and a $43,330 check from LP Solutions. Doc. 80 ("Hancock Decl") ¶ 6. After reviewing the LPS Assignment Agreement, Hancock became concerned "that Mr. McCall had not made a good deal." *Id.* ¶ 7. Hancock called McCall to share these concerns and McCall granted Hancock permission to contact LP Solutions about raising the price set forth in the agreement. *Id*.

According to Hancock, on April 10, 2017, he called Peoples to discuss the LPS Assignment Agreement. *Id.* ¶ 8. Hancock asserts that he asked Peoples to increase the purchase price to $150,000, and that Peoples responded by stating he would check with his partners on the price and that LP Solutions may be able to agree to a different deal structure with better tax consequences for McCall. *Id*. ¶ 8; *c.f.* Peoples Decl. ¶ 6 (recalling that Hancock "asked if LP Solutions would be willing to replace the [LP Agreement] with a different agreement, an Option Agreement . . .").

Also on April 10, 2017, Peoples emailed Hancock:

> Since [the LPS Assignment Agreement] has been executed, it does complicate matters a bit. So I talked to our CEO and we are able to switch it over to the Tax-Deferred Option Program. First we need to receive their check back. Then I'll send out the Option Agreement to the McCall[]s and a PDF copy for you to review. If there isn't any issues [sic] they can execute this new document and once we receive it, we'll issue them a new check . . .
>
> I've attached the overview of the Option Program for you. I'll get you out the Option Agreement tomorrow.

Doc. 69-3.

On April 12, 2017, Peoples separately mailed McCall and emailed Hancock with the option agreement (the "LPS Option Agreement"). Docs. 69-4; 69-5; *see* Doc. 69-6.

In his letter to McCall, Peoples wrote:

> Please find enclosed the [LPS] Option Agreement. Please sign where indicated, keep one Agreement for your records and return the other, along with a copy of your most recent K-1, using the FedEx envelope provided. Upon receipt of the Executed [LPS] Option [Agreement], we will issue a bank check in the amount of your first option payment.

*See* Doc. 69-4. The letterhead includes McCall's address in Tennessee and LP Solutions' address in Maine, and in their reply brief, Abode asserts that this letter and the attached agreements were sent by mail. *Id.*; Doc. 86 at 12. Further, in a handwritten note from Peoples to McCall, also dated April 12, 2017, Peoples wrote:

> I spoke with your financial advisor Dan Hancock and he let me know that the assignment you sent to me was not the best way to handle this transaction. The tax-deferred option program, which is enclosed, will replace what you already signed and not have any tax consequences like the assignment did. I sent a copy to [Hancock] for his review and files. Please don't hesitate to call if you have any questions.

Doc. 79-2. This note was discovered in the records of the Estate. McCall II Decl. ¶ 14.

In an April 12, 2017 email to Hancock, Peoples wrote:

> Here is the Option Agreement for Albert McCall.

> I've sent [the McCalls] a hard copy of it and let them know I sent a copy to you as well. As mentioned in my earlier email, we did send out the payment for the [LP Agreement] to them and they can return that with the executed [LPS] Option Agreement if that is easier for them.

Doc. 69-5.

The LPS Option Agreement attached in both messages has an "effective date" of April 12, 2017, and grants LP Solutions the option to purchase the Partnership Interest for $43,330, the same amount of money as requested in the LPS Assignment Agreement. Doc. 69-6 at 2–3. Pursuant to the agreement, LP Solutions would pay McCall $10,833 upon execution of the agreement, with the remainder due no later than sixty days from McCall's death. Doc. 66 ¶ 43; Doc. 69-6 at 3. The LPS Option Agreement required that McCall "immediately transfer his Partnership Interest," if LP Solutions provided written notice that it was exercising its option. Doc. 69-6 at 4.[12] Further, if LP Solutions failed to make any payment detailed in the agreement, McCall could terminate the agreement with adequate notice and opportunity to cure. *Id.* at 3–4.

Shortly after receiving the email from Peoples containing the LPS Option Agreement, Hancock recalls calling Peoples and asking if LP Solutions could raise the total price offered to McCall under the agreement. Hancock Decl. ¶ 11. Hancock recalls that Peoples indicated LP Solutions may be able to raise the price to $50,000. *Id.* Hancock believes he subsequently called McCall to discuss the LPS Option Agreement and that McCall had no objection to the LPS Option Agreement nor to the potential price increase. *Id.* ¶ 12.

---

[12] Like the LPS Assignment Agreement, the LPS Option Agreement had a choice of law clause stating the contract was to be interpreted and enforced using Maine law. Doc. 69-6 at 5–6.

On April 13, 2017, Hancock wrote Peoples, stating "I have talked with Mr. McCall, he is ok with the deferred option, price adjustment $50,000." Doc. 69-7. According to Hancock's files, Peoples attempted to call him on April 14, 2017, but Hancock could not answer the call. Hancock Decl. ¶ 14.

On April 27, 2017, Hancock again wrote Peoples: "I have the original offer check in my possession which can be returned pursuant to acceptance of the deferred option program. I have not heard from you regarding the offer adjustment to $50,000?" Doc. 69-8. Hancock does not recall having follow-up conversations with Peoples after this message but based on his customary practice, believes that he continued to follow up with Peoples until the discussion about the LPS Option Agreement was concluded. Hancock Decl. ¶ 16. Hancock asserts that he has attempted to locate his emails with Peoples from 2017 but has been unable to do so as his firm "switched computer systems after 2017, and that has made it difficult to locate emails before the switch." *Id.* ¶ 17

The parties disagree as to whether the LPS Option Agreement was ever effective. Peoples declares that LP Solutions never agreed to increase the purchase price under the LPS Option Agreement, and therefore LP Solutions and McCall never reached an agreement on consideration. Peoples Decl. ¶ 15.

However, the Representatives argue the agreement was effective, and they produce one fully signed copy of the LPS Option Agreement found in the Estate's records. *See* Hancock Decl. ¶ 23; Doc. 79-3. Nothing in the signed agreement nor in records of the Estate indicates when McCall countersigned the LPS Option Agreement. McCall II Decl. ¶ 15; Doc. 79-3.

Despite Peoples' declaration to the contrary, Peoples Dec. ¶ 16, the Representatives argue that McCall likely returned a fully executed LPS Option Agreement to LPS Solutions. Doc. 81 at 13. In a review of the Estate's documents, Hancock discovered a copy of Peoples April 12, 2017 letter to McCall and a fully signed copy of the LPS Option Agreement; however, Hancock did not discover a second copy of the LPS Option Agreement nor the FedEx envelope that Peoples sent to McCall. Hancock Decl. ¶ 23. The Representatives argue that this leads to the inference that McCall returned the second fully signed copy of the LPS Option Agreement to Peoples using the FedEx envelope, as directed by Peoples in his April 12, 2017 correspondence with McCall. Doc. 81 at 13.

It is undisputed that LP Solutions never made the payments required by the LPS Option Agreement. Doc. 66 ¶ 53. Further there is no record that McCall returned to LP Solutions the difference between what was owed under the LPS Assignment Agreement and under the LPS Option Agreement. *Id.* ¶¶ 50–51.

*i. LP Solutions and Abode Contact Macombs*

On January 18, 2018, LP Solutions wrote the Macombs general partner to have the transfer of the Partnership Interest to LP Solutions recognized. *Id.* ¶ 31. LP Solutions attached a copy of the LPS Assignment Agreement in support of that request. *Id.* In April 2018, the general partner consented to the transfer of the Partnership Interest to LP Solutions. Kraus Decl. ¶¶ 6–8.

In July 2021, Abode contacted the Macombs general partner to have the transfer of the same Partnership Interest to Abode recognized. Doc. 66 ¶ 34. However, the general partner could not provide consent to Abode because he had already agreed to

accept the transfer of the interest to LP Solutions and was legally bound by that previous decision. Kraus Decl. ¶ 10.

*4. Hancock Contacts LP Solutions in 2021*

In the fall of 2021, someone in Hancock's office found the $43,330 check from LP Solutions to McCall. Hancock Decl. ¶ 18. The check was found by itself, without any accompanying agreement attached. *Id.* Hancock declares that at the time, he did not remember the purpose of the check, and as such, he called Peoples. *Id.* at ¶ 19. According to Hancock, Peoples asserted that the check was made pursuant to the LPS Assignment Agreement which was the controlling agreement between LP Solution and McCall. *Id.* at ¶¶ 19–20. Peoples did not mention the LPS Option Agreement in that conversation. *Id.*

On October 5, 2021, Hancock emailed Peoples, "[t]hanks for refreshing me about [LPS Assignment Agreement] and payment of $43,330.00 cashier's check to . . . McCall back in 2017. Please email me the signed assignment agreement. As we discussed, I am voiding the original check . . . and request a replacement check for the same amount payable to him." Doc. 69-9. On October 14, 2021, Peoples denied Hancock's request because the $43,330 had already been withdrawn from LP Solutions' bank account. Doc. 69-10. Peoples further informed Hancock that, as the check was never deposited, the funds escheated to the state and Peoples would need to reclaim the McCall's funds through the Maine Treasury. *Id.*[13]

[13] In support of its motion, Abode attaches a screenshot of the Maine Unclaimed Property website, which shows that there is a claim for Owner Albert B McCall with an amount "OVER $1000." Doc. 67-7.

*5. The Representatives Contact LP Solutions in 2025*

Over a year and a half after the complaint in the instant action was filed, on May 19, 2025, counsel for the Representatives wrote LP Solutions, in part summarizing Abode's unsuccessful attempt to have the Partnership Interest recognized by the Macombs general partner, and in part informing LP Solutions that it did not own the Partnership Interest, as it had not executed their option pursuant to the LPS Option Agreement. *See* Doc. 69-11.[14] Counsel wrote:

> Notwithstanding Abode's apparent purchase of the Macomb LP interest, we understand that the general partner of [Macombs] has refused to recognize Abode as the owner. Instead, the general partner apparently thinks that [LP Solutions] owns the Partnership Interest. We are writing you because, as discussed further below, the Estate has located another former agreement between Mr. McCall and LP Solutions relating to the LP interest . . . that undercuts this assumption. . . .
>
> We now suspect that the mistaken understanding of [Macombs'] general partner may have two sources. First it appears Abode may not have provided the general partner with formal notice of Abode's 2015 purchase of the [Partnership Interest] interest until sometime in 2023. Second, the general partner appears to have received . . . a copy of [the LPS Assignment Agreement] dated March 22, 2017 . . .
>
> The [LPS Assignment Agreement] could not properly serve as a basis for recognizing LP Solutions as the owner of the [Partnership] Interest. This is because . . . in April 2017, soon after its execution, the [LPS Assignment Agreement] was superseded by a different agreement with LP Solutions—an Option Agreement—that you signed on behalf of LP Solutions. . . .
>
> The [LPS] Option Agreement conditioned LP Solutions' purchase of rights in the [Partnership] Interest on various payments to be made in the future, and on a formal exercise of the option upon Mr. McCall's death. The Executors have conducted a reasonable search and cannot find any evidence that LP Solutions ever made either of the two payments contemplated by the [LPS] Option Agreement. . . . Nor have they found any evidence that LP Solutions ever sent a notice exercising the proposed option . . .

---

[14] In the letter, the McCall Representatives acknowledge that McCall was likely paid under the Abode Assignment Agreement. *See* Doc. 69-11 at 2 ("We now have reason to believe . . . that Mr. McCall did receive payment for the [Macomb] LP Interest in 2015 under the [Abode] Assignment Agreement executed by Mr. McCall and Abode around that time.").

> As this indicates, the Estate believes that the [LPS] Option Agreement (because of a failure to fulfill its requirements for payment and exercise) could not have effected a transfer of the [Macomb] LP Interest, and that LP Solutions has no claim against the Estate with respect to it at this point. (To the extent otherwise necessary, and for the avoidance of any doubt, the Estate repudiates the [LPS] Option Agreement and declares it null and void.)

*Id.* at 2–3.

*6. 56(d) Declaration*

In support of their opposition, counsel for the Representatives, Nathan Sanders, filed a Rule 56(d) declaration identifying facts necessary to their opposition that can only be obtained through discovery. Doc. 78 ("Sanders Decl.").

Sanders asserts that the Representatives are at a disadvantage in procuring facts without discovery as McCall has died and neither of the Representatives were personally involved with McCall's dealings with Abode or LP Solutions. *Id.* at ¶ 5. After McCall's death, the Representatives attempted to learn more about the transactions at issue by reviewing the Estate's files and speaking with Hancock. *Id*. ¶ 10. The Representatives further attempted to discuss the transactions at issue with LP Solutions, but LP Solutions "did not respond substantively to [the] letters or calls." *Id.*

Sanders highlights several arguments in opposition to Abode's motion for summary judgment that depend on additional facts that the Representatives would seek in discovery. At a high level, these additional facts would shed light on: (1) whether McCall's interest in Macombs was subject to the terms of the Partnership Agreement; (2) whether Abode breached the Abode Assignment Agreement by failing to timely pay McCall; (3) whether Abode's delay in reaching out to Macombs was the proximate cause of damages; and (4) whether the LPS Option Agreement fully replaced the LPS Assignment Agreement, such that the transfer of the Partnership Interest to LP Solutions

had not been effectuated, as LP Solutions never exercised their option pursuant to the LPS Option Agreement. *See* Sanders Decl.

**B. Procedural Background**

Abode filed the complaint on March 17, 2023, in the Supreme Court of New York, County of New York. *See* Doc. 1. On August 4, 2023, McCall removed the case to this District. Doc. 1. On October 5, 2023, plaintiff's counsel filed a notice of suggestion of death, alerting the Court that McCall died on September 13, 2023. Doc. 11. On November 16, 2023, Abode and the Representatives filed a signed stipulation which substituted the Representatives for McCall. Doc. 15.

Abode amended the complaint for the first time on November 14, 2024, and for the second time on April 8, 2025. Docs. 23, 48. In the second amended complaint ("SAC"), Abode alleges that McCall breached the Abode Assignment Agreement. Doc. 48 at 14–16. On April 25, 2026, the Representatives filed their answer in which they asserted three affirmative defenses: that Abode's claim was barred by the statute of limitations, that Abode's claim is barred or estopped by laches, and that Abode failed to mitigate any damages. Doc. 49.

On November 14, 2025, Abode filed a pre-discovery motion for partial summary judgment. Doc. 64. Abode seeks summary judgment in its favor on the issue of liability on the breach of contract claim, as well as on each of the Representatives' three affirmative defenses.[15] *See* Doc. 65. On February 3, 2026, the Representatives submitted their opposition to Abode's motion and their Rule 56(d) declaration. Docs. 78–81. On March 24, 2026, the motion was fully briefed. *See* Doc. 86.

---

[15] Abode does not seek summary judgment on damages. Doc. 65 at 14.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free School District*., 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc*., 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp*., 368 F.3d 123, 126 (2d Cir. 2004)). Generally, to defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256–57 (1986)).

## III. DISCUSSION

Abode requests that the Court grant partial summary judgment with respect to liability for its breach of contract claim as well as to the Representatives' affirmative defenses. Doc. 65 at 14–27. In essence, Abode argues that McCall and Abode validly entered into the Abode Assignment Agreement in June 2015; that Abode performed its payment obligations under the agreement; and that McCall breached his obligations by selling the Partnership Interest to LP Solutions. *Id.* at 15–20. Abode further argues that the Representatives' affirmative defenses fail because the complaint was filed within the

applicable statute of limitations, the breach of contract claim is not barred by laches, and there is no issue concerning failure to mitigate. *Id.* at 24–27.

The Representatives argue that there are outstanding factual issues that preclude the pre-discovery motion for summary judgment and also that Abode' legal conclusions are incorrect. *See* Doc. 81. The Court first turns to the Representatives' arguments concerning outstanding issues of fact.

"Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom v. U.S. Department of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000). "Indeed, 'summary judgment [should] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.'" *Elliott v. Cartagena*, 84 F.4th 481, 493 (2d Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)). While "granting summary judgment before the parties have engaged in discovery may be disfavored, where . . . 'the issue to be decided is limited to a pure question of law, such as the interpretation of unambiguous contract language, summary judgment may be appropriate.'" *Chachkes v. David*, No. 20-CV-2879 (LJL), 2021 WL 101130, at *6 (S.D.N.Y. Jan. 12, 2021) (quoting *MCC Non Ferrous Trading Inc. v. AGCS Marine Insurance Co.*, 2015 WL 3651537, at *3 (S.D.N.Y. June 8, 2015) (collecting cases)).

"'[W]hen a party facing an adversary's motion for summary judgment reasonably advises the court that it needs discovery to be able to present facts needed to defend the motion, the court should defer decision of the motion until the party has had the opportunity to take discovery and rebut the motion.'" *Elliott*, 84 F.4th at 493 (quoting

*Commercial Cleaning Services, L.L.C. v. Colin Service Systems, Inc.*, 271 F.3d 374, 386 (2d Cir. 2001)). In relevant part, Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." *Ezrasons, Inc. v. Travelers Indemnity Co.*, 89 F.4th 388, 403 (2d Cir. 2023) (quoting Fed. R. Civ. P. 56(d)). The Second Circuit has established that the party opposing summary judgment pursuant to Rule 56(d) must satisfy the four *Meloff* factors by identifying: "(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Meloff v. New York Life Insurance Co*., 51 F.3d 372, 375 (2d Cir. 1995).

The Court finds that the Representatives have satisfied the Rule 56(d) requirements such that discovery should occur prior to adjudication of Abode's motion. While not all of the Representatives' four Rule 56(d) arguments would independently meet this standard, the Court is satisfied that factual issues concerning the validity of the LPS Option Agreement are material, such that the parties should engage in discovery. The Representatives argue that discovery may reveal that the LPS Option Agreement validly replaced the LPS Assignment Agreement, and because LP Solutions never exercised their option, McCall never sold the Partnership Interest to LP Solutions.

With respect to the first *Meloff* factor, in order to determine if the LPS Option Agreement was controlling, the Representatives seek discovery concerning when McCall signed the LPS Option Agreement; whether McCall sent the fully signed LPS Option

Agreement to LP Solutions; whether Hancock's April 13, 2017 message to Peoples constituted a counter-offer or "merely [a] request[] to increase LP Solutions' offer"; and whether, at some point after Hancock asked about the price increase, if LP Solutions conveyed that the terms of the original LPS Option Agreement were still valid, such that McCall could accept the offer. Sanders Decl. ¶¶ 20–25. To do so, the Representatives seek discovery of LP Solutions, of FedEx, and deposition testimony of Hancock and Peoples. *Id.*

With respect to the second *Meloff* factor, the Representatives argue that these facts are material, because, if the LPS Option Agreement were controlling, McCall did not breach the Abode Assignment Agreement because as LP Solutions never exercised their option to effectuate the transfer of the Partnership Interest. *See* Doc. 81 at 23. Abode makes no argument that it should prevail on its motion for summary judgment if the LPS Option Agreement is controlling; rather, Abode argues that the undisputed facts demonstrate that the LPS Option Agreement could not have replaced the LPS Assignment Agreement. Doc. 86 at 10–17. Abode's arguments are insufficient at this juncture.

First Abode argues that it was impossible for McCall to sign the original LPS Option Agreement before Hancock provided a counter-offer; and as LP Solutions never agreed to the price increase, there was never a valid offer for McCall to accept. Doc. 86 at 11–13. On April 12, 2017, Peoples mailed the original LPS Option Agreement from LP Solutions' office in Maine to McCall's address in Tennessee. *Id.* at 11–12; *see* Doc. 69-4. By the end of April 13, 2017, Hancock had called and emailed Peoples concerning a potential price increase on the LPS Option Agreement. Hancock Decl. ¶¶ 11, 13. Abode argues that it was impossible for McCall to have received and signed the LPS

Option Agreement mailed on April 12, 2017 before Hancock's April 13, 2017 email. Doc. 86 at 12. Abode further argues that Hancock's April 13, 2017 inquiries constituted a counter-offer; that Hancock's April 27, 2017 message following up on price increase confirmed this understanding; and that as Peoples declares that LP Solutions never agreed to the raised price, there was never an agreement on consideration as to the LPS Option Agreement. Doc. 86 at 11–13. However, assuming Abode is correct, as the Representatives point out, this does not foreclose the possibility that LP Solutions agreed to reinstate the initial offer after April 27, 2017. *See* Sanders Decl. ¶ 23.

Though he cannot recall additional conversations, Hancock believes—based on his customary business practice—that he continued to follow up about the price of the LPS Option Agreement until there was some conclusion on the price. Hancock Decl. ¶ 16. It is true that "vague denials and memory lapses . . . do not create genuine issues of material fact," *F.D.I.C. v. National Union Fire Insurance Co.*, 205 F.3d 66, 75 (2d Cir. 2000), and that "failure of recollection cannot serve as proof positive that the unrecollected fact did not occur," *Savarese v. City of New York*, 547 F. Supp. 3d 305, 349 (S.D.N.Y. 2021). However, in the context of pre-discovery motions for summary judgment, the Second Circuit has acknowledged the role that discovery may play in refreshing a declarant's memory. *See e.g. Elliott*, 84 F.4th at 494 (in evaluating a Rule 56(d) declaration, finding that "'[f]urther discovery as to [Plaintiff's] recollection" of the meeting at which a contract was formed and the contract at issue "may clarify the facts of this case, may reflects the recollections of [Plaintiff], and may lead to the discovery of relevant' evidence" (quoting *Seneca Beverage Corp. v. Healthnow New York, Inc.*, 200 F. App'x 25 (2d Cir. 2006))).

Regardless, in the instant case, to support finding that the parties did reach a valid agreement on the LPS Option Agreement, the Representatives provide more than Hancock's belief that he followed up with Peoples, they also produce a fully signed LPS Option Agreement. *See* Hancock Decl. ¶ 16; 79-3 (fully executed LPS Option Agreement). While Peoples declares that "LP Solutions never agreed to the purchase price increase under the [LPS] Option Agreement . . . " he does not affirmatively state that the record before the Court is the complete history of Peoples' and Hancock's communications on the matter.[16] Peoples Decl. ¶ 15.[17] Additional discovery could demonstrate that the initial offer was reinstated, and therefore McCall's the fully signed LPS Option Agreement was operative.

Abode next argues that the LPS Option Agreement's effectiveness was conditioned upon the return of the $43,330 associated with the LPS Assignment Agreement, and as the check was undisputedly never returned, the LPS Option Agreement cannot have replaced the initial agreement. Doc 86 at 14–15. However, whether return of the $43,330 was a precondition to the LPS Option Agreement is disputed. On the one hand, Peoples' April 10, 2017 email to Hancock does appear to condition execution of the LPS Option Agreement upon receipt of the $43,330 check and Hancock's April 27, 2017 message also acknowledges that the check would be returned

---

[16] In his declaration, Peoples states "LP Solutions never agreed to increase the purchase price under the [LPS] Option Agreement to $50,000. As such, LP Solutions never reached an agreement with McCall regarding the consideration that would be paid under the Option Agreement." Peoples Decl. ¶ 15. However, as identified below, whether the parties later reached an agreement concerning consideration may depend on any subsequent communications between Hancock and Peoples.

[17] Courts in this circuit have found that where a party's pre-discovery motion for summary judgment hinges on a declaration, the opposing party should have an "opportunity to test the veracity of the 'undisputed' facts set forth in the[] declarations" through depositions. *See e.g. V.W. by & through Williams v. Conway*, 236 F. Supp. 3d 554, 580 (N.D.N.Y. 2017).

upon execution of the LPS Option Agreement. Doc. 69-3 (Peoples' April 10, 2017 email to Hancock stating, "First we need to receive their check back. Then I'll send out the [LPS] Option Agreement . . ."); Doc. 69-8 (Hancock's April 27, 2017 email to Peoples stating "I have the original offer check in my possession which can be returned pursuant to acceptance of the differed option program"). On the other hand, however, the LPS Option Agreement itself makes no mention of repayment of the LPS Assignment Agreement check;[18] Peoples' April 12, 2017 email to Hancock containing the LPS Option Agreement uses less explicit language than the April 10 email; and further Peoples' April 12, 2017 letter to McCall with the option agreement does not mention repayment of the $43,330 at all. *See* Doc. 79-3; Doc. 69-5 (Peoples' April 12, 2017 email to Hancock, "As mentioned in my earlier email, we did send out the payment for the [LPS Assignment Agreement] to [the McCalls] and they can return that with the executed [LPS] Option Agreement"); Doc. 69-4 (April 12, 2017 letter from Peoples to McCall, not mentioning the LPS Assignment Agreement payment). Further as discussed above, if there were additional conversations between Hancock and Peoples, those discussions would be relevant to determining whether this condition still applied.[19]

---

[18] In their reply, Abode argues that Peoples' April 12, 2017 email to Hancock should be construed as part of the contract under Maine law, and that email clearly indicates that the check needed to be returned prior to the LPS Option Agreement taking effect. *See* Doc. 86 at 15 (citing *Hilltop Community Sports Center, Inc. v. Hoffman,* 755 A.2d 1058, 1062 (Me. 2000) (finding that a sale agreement, a letter, a bill of sale, which were all executed at the same time for the same purpose should be construed together); *see also* Doc. 69-5 (Hancock's April 12, 2017 email to Hancock, which states "as mentioned in my earlier email, we did send out the payment for the [LPS Assignment Agreement] to [the McCalls] and they can return that with the executed [LPS] Option agreement if that is easier for them."). Abode does not cite caselaw indicating that such language is sufficient to create a condition precedent. In Peoples' April 12, 2017 letter to McCall, no mention of the return check was made. *See* Doc. 69-4. Further as detailed above, even if such a condition was initially imposed, whether the condition was waived may depend on the full discussion history between Hancock and Peoples.

[19] Abode similarly argues that a return of the fully executed LPS Option Agreement was a condition precedent to the validity of the agreement. Doc. 86 at 14. Peoples declares that no fully executed LPS

Abode additionally argues that the subsequent conduct of LPS Solutions and Hancock confirms that the LPS Assignment Agreement remained in place. Doc. 86 at 15–16. In support, Abode points to the fact that LP Solutions presented the LPS Assignment Agreement to the Macombs' general partner in 2018; that it never made any payments under the LPS Option Agreement; that in October 2021, Hancock contacted LP Solutions about the $43,330 check pursuant to the LPS Assignment Agreement; and that in May 2025, the Representatives wrote LP Solutions and stated that the LPS Option Agreement could not have effected a transfer of the Partnership Interest. *Id.* The Representatives contest this characterization. First, according to Hancock's own declaration, when he encountered the $43,330 check in 2021, he did not remember why LP Solutions had sent it to McCall and he therefore called Peoples. Hancock Decl. ¶ 19. According to Hancock, the reason he thought the LPS Assignment Agreement at the time was Peoples' assurances, which Hancock accepted without scrutiny. *Id.* ¶¶ 19–20. Second, the Representatives' May 2025 letter to LP Solutions purports to repudiate the LPS Option Agreement due to LP Solutions failure to pay under the contract; but it does not state that the LPS Option Agreement was never effective nor that the LPS Assignment Agreement was controlling. Doc. 69-11. Further, even if the parties conduct were uniform, Abode cites no caselaw to support that finding that this conduct should resolve the issue at hand.

---

Option Agreement was returned to LP Solutions. Peoples Decl. ¶ 16. As discussed above, such a condition is not present in the text of the LPS Option Agreement and the existence of such a condition precedent may depend on how communications between McCall and LPS Solutions concluded. *See* Doc. 79-3. Further, the McCall Representatives dispute the fact that the fully executed LPS Option Agreement was not returned to LP Solutions. *See* Doc. 81 at 25. They argue that the Estate encountered Peoples' April 12, 2017 letter in addition to the one fully signed LPS Option Agreement, but did not discover the second LPS Option Agreement or FedEx envelope—which, according to the letter's message were also attached—suggests that McCall may have returned a fully executed LPS Option Agreement to LP Solutions. *Id.*

Finally, Abode argues that because LP Solutions failed to pay the $10,833, which according to the LPS Option Agreement was to be paid "upon execution" of the agreement, the LPS Option Agreement was never effective. Doc. 86 at 16–17. However, Abode cites no applicable caselaw demonstrating that where payment due upon execution of a contract is not made, the contract is void *ab initio*, rather than breached by the nonpaying party. *See id*. Accordingly, the Representatives satisfy the second *Meloff* factor.

With respect to the third and fourth *Meloff* factors, the Representatives declare that they have already attempted to engage with LP Solutions, but that LP Solutions "did not respond substantively to [their] letters or calls" Sanders Decl. ¶ 10. For a pre-discovery Rule 56(d) declaration, this is sufficient. *See also* Elliott, 84 F.4th at n.12 (the Second Circuit stating that they did not need to evaluate *Meloff* factors three and four where the plaintiff "was not afforded any discovery at all and there is no indication that [plaintiff] could have obtained the requested information through other means.").

As the Representatives have satisfied their 56(d) burden to demonstrate that discovery should proceed, the Court denies Abode's motion for partial summary judgment without prejudice.

## IV. CONCLUSION

For the reasons set forth above, Abode's pre-discovery motion for partial summary judgment is denied without prejudice until discovery is completed, at which point it may be re-filed. By no later than August 18, 2026, the parties are directed to file, on consent, a proposed discovery plan, with all discovery to be completed by February 18, 2027.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 64.

It is SO ORDERED.

Dated: August 10, 2026
New York, New York

EDGARDO RAMOS, U.S.D.J.